LESTER KRIEGER,
Plaintiff,

*vs.*

THOMAS D. ANDERSON, THEODORE E. SWIGART, ERNEST T. SKINNER, W. T. CARTER, III, GEORGE R. BRYANT, DILLON ANDERSON, JOHN M. BENNETT, JR., JOHN H. BLAFFER, RORICK CRAVENS, ROBERT K. HUTCHINGS, J. W. LINK, JR., CHARLES A. PERLIZT, JR., LAWRENCE S. REED, EDWARD ROTAN, FRANK STRACHAN, FUNDS, INC., and TEXAS FUND, INC.,
Defendants.

*New Castle, August 4, 1961.*

*Irving Morris,* of Cohen & Morris, Wilmington, and *Abraham L. Pomerantz* and *William E. Haudek,* of Pomerantz, *Levy &* Haudek, New York City, for plaintiff.

*Aaron Finger,* of Richards, Layton & Finger, Wilmington, and *David W. Peck, Alfred Jaretzki, Jr.,* and *Marvin Schwartz,* of Sullivan & Cromwell, New York City, for defendants, Thomas D. Anderson, Theodore E. Swigart, Dillon Anderson, John M. Bennett, Jr., John H. Blaffer, Rorick Cravens, Robert K. Hutchings, J. W. Link, Jr., Charles A. Perlitz, Jr., Lawrence S. Reed, Edward Rotan and Frank Strachan.

*James M. Tunnell, Jr.,* of Morris, Nichols, Arsht & Tunnell, Wilmington, for defendants, Ernest T. Skinner, W. T. Carter, III and George R. Bryant.

*William S. Potter,* of Berl, Potter & Anderson, Wilmington, for defendant, Funds, Inc.

*William F. Lynch, II,* of Morris, James, Hitchens & Williams, Wilmington, for defendant, Texas Fund, Inc.

SEITZ, Chancellor: This is a stockholder's derivative action brought on behalf of Texas Fund, Inc. ("Fund"), a Delaware corporation, which has a net asset value of about $38,000,000. The complaint deals with the sale of the stock of Fund's investment adviser and principal underwriter, Management Company ("Management"—not a defendant) to one of the defendants, Funds, Inc., which is a Delaware corporation, formed for the purpose of acquiring such stock. The other defendants are the stockholders of Management and the three non-affiliated directors of Fund.

Plaintiff claims that for $1,000,000 in excess of the fair value of the Management stock the selling stockholders undertook to use and in fact used their fiduciary positions with respect to Fund for the benefit of the purchaser. Plaintiff makes no distinction between the various selling shareholder defendants as to the basis of possible liability. Plaintiff also asserts that these defendants diverted presumably either to Management or the selling stockholders a corporate opportunity belonging to Fund. The defendants have denied liability on several grounds which are considered hereafter.

After elaborate discovery defendants other than Fund filed a motion for summary judgment and this is the decision thereon.

Fund is registered with the Securities and Exchange Commission under the *Investment Company Act of* 1940, 15 *U.S.C.A.* § 80a-1 *et seq.,* as an open-end diversified investment company. It was organized in 1949 by a group of leading Texas business and professional men for the purpose of investing primarily in promising companies and industries in the southwestern part of the United States. These same men also organized at the same time corporations to act as investment adviser and principal underwriter to Fund. In 1955 they were combined into Management.

Management's stated function was to provide investment research, advice and supervision and make investment recommendations to Fund pursuant to an investment advisory contract last approved by the stockholders of Fund in 1955. Annual approval by the directors of the Fund has been given since that date. Under the advisory contract Management also was required to furnish at its own expense all necessary administrative services, office space, equipment, and personnel for managing the affairs of Fund. It was also to provide compensation for directors and officers of the Fund. Fund has no office or employees.

The underwriting agreement is essentially the same as the advisory contract with the exception that no stockholder approval is needed for its reinstatement.

The directors or stockholders of the Fund had the power to terminate either contract at any time upon sixty days' notice and upon assignment thereof automatic cessation would result. "Assignment" was defined to include the transfer of the controlling stock of Management. Upon termination of the advisory contract reinstatement required the approval of the stockholders of Fund owning a majority of the shares.

For reasons I need not explore, certain leading stockholders of Management initiated negotiations in the latter part of 1959 to sell their stock to another group of successful business men in the investment world desirous of obtaining control of Management for investment purposes. The leading men were Dillon Anderson and Thomas D. Anderson, hereafter called the "defendants" unless otherwise noted.

A letter offer was made on September 21, 1959 by two individuals to buy all of the outstanding common and preferred stock of Management for the price of $1,354,000. There was a provision for the purchase of not less than 70% but it is not important here. The offer was subject, *inter alia,* to the conditions that the sale be approved by Funds' stockholders and appropriate regulatory authorities. It provided for acceptance by October 1, 1959 and, if accepted, that a full contract was to be worked out fixing future steps to carry out the agreement. The stockholders of Management, by letter dated September 25, 1959, signed by Thomas Anderson, the president and a director of Management, accepted the offer on the conditions that it be approved by stockholders of Fund and the proxy material be approved by the S.E.C. The purchase was later consummated in the name of the defendant, Funds, Inc., as purchaser.

The book value of Management as of August 31, 1959 was $126,486.73. According to plaintiff, its net assets were then worth $123,581.57. Financial statements of Management for the years 1955-59 disclose its net earnings averaged $17,484 per year, ranging from a loss of $10,524.87 in 1955 to a gain of $34,933.37 in 1959.

Two of the stockholders of Management, Thomas D. Anderson and Swigart, were two of the five directors of Fund; Thomas D. Anderson also being Vice President and Treasurer.

At the acceptance date all of Management's common stock was held by twelve of the fifteen individual defendants. Dillon Anderson owned 18.37% for which he was to receive about $248,000; Thomas D. Anderson owned 10.43% for which he received $141,235, and Theodore E. Swigart owned 1.86% for which he received $25,131.

The other three directors of Fund who recommended approval, George Bryant, W. T. Carter, III and Ernest Skinner, defendants herein, held no stock in Management, nor any office or directorship therein. Carter was also President of Fund but performed no services and served without remuneration. All three did hold small blocks of Fund stock. The selling stockholders of Management held Fund stock worth about $2,500,000 amounting to 7½% of the outstanding shares.

On October 15, 1959 representatives of the selling stockholders and the buyer met and agreed on a slate of personnel for the board of directors of Fund and Management. They also agreed on most of the personnel of the Fund Management Advisory Committee, which committee made investment decisions for Fund. Plaintiff claims they lacked such power. Skinner and Bryant were to be replaced on Fund's board by Runnells and Taylor, representatives of the purchaser. Defendants would add that such action was dependent upon the willingness of Skinner and Bryant to step aside. Indeed, the resignations of two of the so-called independent directors (Skinner and Bryant) were conditioned upon the reinstatement of the advisory contract by the vote of the stockholders of Fund. Carter, III, Thomas Anderson and Swigart, encumbents, were to remain on the board of Fund. The president of Fund agreed to resign so that a representative of Funds, Inc., could succeed him. This was part of the plan approved before submission of the matter to the shareholders of Fund.

Dillon Anderson's office drafted the proxy solicitation material for submission to the S.E.C. Then, on November 3, 1959 the board of directors of Fund considered whether the two service contracts should be renewed in the event the stock sale was consummated. Swigart, Skinner and Carter, III were present and voted to approve

the reinstatement of the two contracts. Thomas Anderson had stepped out of the meeting because of his admitted substantial interest in Management.

█ Plaintiff says the director action was ineffective, presumably under Delaware law, because Swigart, one of the three necessary to make a quorum, was "interested" through his stock ownership in Management. Since the Investment Company Act of 1940 required stockholder approval of the reinstatement of the investment advisory contract, which was later given, the point is moot as to that contract. As to the underwriting contract, since its reinstatement could not take place before the stock sale was completed which terminated the existing contract, it would appear that this director vote was merely advisory. In any event plaintiff does not seek to have the stock sale set aside. Thus, the director action is relevant only to the issue as to whether they were functioning as uninfluenced fiduciaries at the time.

On January 6, 1960, the S.E.C. advised that it did not intend to object to the solicitation of the stockholders of the Fund for reinstatement of the advisory contract. On February 3, 1960, a proxy, solicited on behalf of both Fund and Management but paid for by the sellers and buyers, and a notice went out advising the stockholders of a special meeting to vote on the following two specific subjects:

(1) Approval of the reinstatement of the investment advisory contract of the Fund with Texas Fund Management Company upon transfer of the capital stock of the latter Company.

(2) Subject to such approval, electing a board of five directors.

█ The proxy material recited that in the event the Management contract was reinstated, the directors to be proposed were to be Thomas Anderson, Carter and Swigart, encumbents, plus Runnells and Taylor, representing the purchasers. I pause to note that the stockholders of Fund were not asked expressly to vote to approve the sale of the Management stock even though the offer and acceptance letters called therefor. Whether their reinstatement of the

advisory contract so connotes I need not decide. In any event, the requirement was not a "legal" one in the sense that the law imposed it. Since it was a condition imposed by the parties, a third party cannot be heard to object under the circumstances.

On March 1, 1960, the majority of Fund's shares were voted in favor of reinstatement of the advisory contract following the sale of the Management stock. The resignations of Bryant and Skinner were declared effective. Five directors were then elected including the two designees of the purchaser. At a directors' meeting held later on the same day the board unanimously agreed that it was still in Fund's best interest to renew the underwriting agreement with Management. Presumably it was to be executed after the stock sale was consummated. Plaintiff does not claim that a quorum was at this meeting. This action was filed on the same day seeking an accounting from the defendants other than Fund for the "excess" over the fair value of the shares sold.

On March 29, 1960, the Management shares were actually transferred to Funds, Inc. The service contracts were declared terminated and were reinstated at once. Plaintiff does not raise a quorum question as to this action. The issue here would seem to be confined to the breach of duty charge.

I first consider plaintiff's claim that defendants breached a fiduciary duty owed Fund. Plaintiff argues that $1,000,000 of the purchase price represents payment to the selling stockholders for the use of their fiduciary powers (1) to cause the solicitation of Fund's stockholders and to acquire their approval of the reinstatement of the advisory contract, (2) to secure the resignations of Bryant and Skinner, (3) to secure the nomination and election of Taylor and Runnells as new directors of Fund, (4) to secure the resignation of Carter, III as President of Fund, and (5) to secure reinstatement of the underwriting contract by the directors of the Fund.

Plaintiff asserts no claim based on the Investment Company Act. He relies upon general equitable principles applicable to fiduciaries under Delaware law. Various legal principles are invoked

so loosely and in such combinations by the parties that it is almost as important to state what is not before the court as to delineate the issues for determination.

Plaintiff seems to rely upon the principle making it illegal to sell corporate office.

The two director defendants of Fund who conditionally resigned had no stock interest in the Management Company. The same is true of defendant, Carter, III who remained as a director but who stepped down as president of Fund to be replaced by a nominee of the purchaser. Nor is there anything in this record to suggest that they received anything of value for their actions. Thus, the court is not concerned with the principle of law rendering illegal the "sale" of corporate office by a person holding such office.

Plaintiff argues that the defendants sold "control" of Fund. Defendants say there was no such sale. They so argue because three of the five directors of the Fund who were elected after the renewal of the advisory contract were not nominees of or thereafter economically interested in the Management Company. It is somewhat difficult to analyze plaintiff's contention because it appears to confuse two legal concepts. Plaintiff claims that the record shows that the so-called non-affiliated directors who, in effect first recommended reinstatement of the advisory contract and who approved reinstatement of the underwriting contract, were not in fact independent of the control of the selling defendants. Assuming this to be so, it does not follow that "control" of Fund was sold unless those in control after the completion of the sale were in fact subject to the directions of the purchaser. Certainly that is at least a disputed factual issue on this record.

Plaintiff really confuses two "control" situations. What plaintiff is primarily contending, as I view it, is that the defendants, contrary to law, used their fiduciary positions for personal gain by exercising their alleged control over the Fund directors (1) to cause Fund to solicit and secure shareholder approval of the reinstatement of the advisory contract and to cause the board to reinstate the underwriting contract and (2) to cause two of the directors and the

president to resign and be replaced by nominees of the purchaser. This fiduciary principle applies, if the pertinent facts are proved, whether or not its use for personal gain resulted in the transfer of "control" of the corporation to those paying such consideration to the fiduciary. If such a change of control of Fund did take place that would, however, be relevant to the issue as to what the sellers in fact sold.

We are not, then, involved with the "simple" case of the passage of control incident to the sale of stock. Indeed, it is important to note that we are not concerned with any issue concerning the exercise of a fiduciary duty owed or sale of control of the corporation whose shares were sold.

■ The defendants necessarily concede that Fund and Management solicited and received stockholder approval of the reinstatement of the advisory contract, that the board reinstated the underwriting contract, that the two directors and the president resigned and were replaced by nominees of the purchaser and that such matters were initiated by the defendants. Defendants say these things were not part of the agreement of sale because they were first considered and approved by the parties after the offer and acceptance letters were delivered. These letters contemplated a later formal contract which never was executed. In any event, if defendants in fact used the power of their fiduciary positions for personal gain they are legally responsible regardless of the form and sequence of their undertakings.

■ The issue, then, is whether the defendants were paid to do the things and to cause the acts to be done which are set forth above. The record evidence on that issue is such as to require a trial. If defendants received a sum in excess of the "fair value" of their shares, as plaintiff charges, it could well be ascribable in their hands to payment for the things defendants did as part of the total understanding between the parties. As such, in my view, it could justify the inference that it constituted personal payment for the breach of a fiduciary duty owed a corporation whose shares they were not selling and whose shares they did not control directly or indirectly.

Compare *Ballantine v. Ferretti, Sup.,* 28 *N.Y.S.2d* 668. Disclosure, despite its magnitude, would not here be a defense absent unanimous approval, which is admittedly absent.

One basic evidentiary issue at trial will be whether the defendants received only the fair value of their shares. Defendants say the relevant portions of the record show without dispute that the price paid was fair. Their contention is based on the admitted fact that the price paid was the result of arm's-length negotiations. But that does not dispose of this case because it assumes that because the purchasers were willing to pay the stipulated price it is necessarily to be equated with the "fair value" of the shares. If defendants received a sum in excess of the fair value of the shares, based on any reasonable standard, it could mean that the purchasers paid for something in addition to the stock, and that "something" might fairly be related to the various actions taken by defendants which practically insured the reinstatement of the service contracts.

But defendants insist that they have presented sworn evidence that the price was fair under any standard and that plaintiff has offered no countervailing sworn matter. They contend that under such circumstances, on a motion for summary judgment, their evidence must be taken to be true. I have reviewed the record rather carefully on this issue. The record leaves much to be desired. Neither side has attempted to show explicitly that the fair value was equivalent to the selling price. As noted, I do not believe the fact that the amount was reached in connection with an arm's-length transaction is here decisive.

I conclude that, for purposes of deciding this motion, the record is not sufficient to justify the confident conclusion as a matter of undisputed fact that the price paid represented the fair value of the shares sold. If the parties desire to continue their quarrel on this issue I will permit proper additions to the record so they may develop this matter more fully. I note, however, that such a procedure may well do no more than delay the final determination.

The court must have all the evidence before it can decide whether in fact the defendants used their fiduciary powers for per-

sonal gain. At this stage the court will not attempt to delineate the factors pertinent to the "fair value" issue except to say that the "good will" or "expectancy" value arising from the possibility of renewal will be a relevant value factor. Since defendants tacitly concede that their relations with Fund must be judged by standards applicable to fiduciaries, I assume, unless the parties desire to argue the matter, that defendants will have the burden of showing that they did not violate their obligations.

Defendants say that *S.E.C. v. Insurance Securities Inc., 9 Cir.,* 254 *F.2d* 642, *certiorari denied* 358 *U.S.* 823, 79 *S.Ct.* 38, 3 *L.Ed.2d* 64, and *Manacher v. Reynolds, 39 Del.Ch.* 401, 165 *A.2d* 741 are conclusive in their favor. The *Insurance Securities Inc.* case is distinguishable because the court there concluded that the fiduciary duty which the selling management company directors and leading stockholders owed to the Fund terminated with the unconditional sale of their shares. In our case the defendants tacitly concede that they owed a fiduciary duty to the shareholders of Fund which was in existence at the time they took the actions of which plaintiff complains.

The *Reynolds* case is not in point, *inter alia,* because we are here dealing with the sale of stock of a company having no direct or indirect stock interest in the company allegedly wronged. If there was payment for sale of control of Fund, it cannot legally be justified as payment for an element of value belonging to the Management stock.

Whether all the selling defendants can be held liable for direct breaches of fiduciary duty or whether some can only be charged as participants with a fiduciary in a breach of his trust need not now be decided. The fact that the selling defendants other than the principal negotiators permitted the conceded fiduciaries to represent them in the sale is sufficient to require a trial of the issue of the possible liability of all the selling stockholders. The conduct of the other defendants (except Fund) is such that their liability, if any, must also await the findings of fact after trial.

I come now to plaintiff's contention that "defendants' sale of control deprived the Fund of a valuable opportunity". If by "sale

of control" the plaintiff means to assert that after the sale of the Management stock the purchaser was in fact in control of Fund's board, the answer must be that the matter is in dispute. But "sale of control" would not seem to be decisive of the plaintiff's claim. Thus, despite the above quoted formulation of plaintiff's argument, it would appear that plaintiff is actually contending that defendants, by their use of their control of the Fund board, deprived Fund of the opportunity to negotiate directly with the purchaser for some or all of the "premium" it was allegedly willing to pay for securing the Management stock and thus the service contracts. What are the facts?

██ The defendants approached the representatives of the buyer about the possibility of selling them the Management stock. This they had the right to do. I am also satisfied that absent any breach of duty, they had the right to obtain what they could for such shares. Certainly this would include the good will element of value arising, *inter alia,* from the expectancy of renewal of the service contracts, at least in the hands of the sellers. I say this because it was an element of value built up by the defendants and is not to be ignored merely because the Investment Company Act requires a termination of advisory contracts when control is sold. The termination provision is to protect the investors of the Fund. If such good will value is not to be considered a legitimate element of value inhering in such stock, it is for the Congress to say so. Up to now it has not and the Delaware law contains no such prohibition.

██ The foregoing analysis does not dispose of the matter because the defendants also owed a general fiduciary duty to Fund arising out of their relationship to Fund. One asks, then, what duty they owed Fund in this situation. Clearly defendants owed Fund's board the duty of disclosing what they intended to do. This disclosure was made. They also owed the board of Fund the duty of not interfering with its exercise of its judgment in deciding what was best for Fund in the light of this development. This is the duty which plaintiff in effect claims was violated.

██ The non-affiliated directors of Fund purported to discharge their responsibility at the meeting of November 3, 1959. Thus, after

discussion of several possibilities incident to the forthcoming termination of the service contracts because of the sale of the Management stock, they concluded, *inter alia,* that premised on the book value of and the purchase price to be paid for the Management stock, they found nothing to object to from the standpoint of the stockholders of Fund. They, in effect, also affirmed their belief that the reinstatement of the contracts with Management after the sale of its stock would be, under the circumstances, in the best interest of Fund.

If the foregoing action of the board was taken in the exercise of untrammeled "business judgment", that is the end of the matter. But if, as alleged, defendants exercised such domination and control over the board of Fund that it did not really discharge its duty to do what was best for Fund, then defendants breached their fiduciary duty. This is not then, strictly speaking, a case where defendants have allegedly diverted a corporate opportunity. Rather, if proved, it is a case where defendants have abused their fiduciary power by preventing the possibility that Fund's board could have developed another opportunity directly with the prospective purchaser of the Management shares.

Since, in my view, the domination and control of the non-affiliated members of the Fund board and the improper use thereof by defendants is in dispute, despite the sworn statements by such directors that they were not so influenced, the issue must be tried.

If an abuse of fiduciary position is proved, it is pertinent to consider the measure of recovery for Fund. Parenthetically, plaintiff presumably would agree that even if successful on both theories he could not have a double recovery. Initially, it will not be possible to find what dollar benefit, if any, Fund might have recovered had there been no breach of duty. If the sellers received only the fair value of their shares in their hands one could not say that they personally benefited by their breach of duty. Indeed, proof that they received only fair value would be evidence that they did not exercise domination and control over the Fund board. But, if defendants received more than "fair value" and if the breach of

duty is proved, I believe the excess over fair value should belong to Fund. I say this because defendants should not be permitted to profit by their breach of duty.

I should add that "fair value" here will embrace the same factors as are found to be relevant to that issue in the first point discussed. I do not consider the *Insurance Securities Inc.* case controlling on this issue for reasons already given.

■ Defendants next argue that the sale of the Management stock was ratified and approved by the shareholders of Fund. Assuming, although they were not explicitly asked to do so, that the effect of the stockholder vote was to approve the sale of the Management stock, that would not constitute approval of the breaches of fiduciary duty for personal gain, if they are proved. I say this because such breaches of duty could not be ratified absent unanimous stockholder approval. By their nature they cannot be the subject matter of effective disclosure to the stockholders. Thus, the claims made by plaintiff, if proved, do not fall within the area where the judgment of the majority stockholders is rightfully accepted as the final word.

I do not believe the opinion of the Vice Chancellor in *Lewis v. Hat Corp. of America,* 38 *Del.Ch.* 313, 150 *A.2d* 750 would apply to a situation where there is allegedly a breach of fiduciary duty for personal gain and the facts are in dispute. The facts in the *Hat Corp.* case "were simple and not seriously challenged" and thus justified summary judgment treatment. See the Vice Chancellor's comment thereon in *Abelow v. Symonds, ante, p.* 36, 173 *A.2d* 167.

I conclude that plaintiff's claim is not barred by the doctrine of ratification.

■ Defendants next argue that plaintiff's claims are barred by estoppel and acquiescence. These defenses of defendants seem to be based on the premise that plaintiff did not object to or vote against the renewal of the advisory contract and did not bring this action until the day of the stockholders' meeting. Estoppel and acquiescence have elements. in common but each suggests that a

party's conduct misled another into believing that the party had accepted a transaction. Plaintiff brought his claim to the attention of defendants by bringing this action about 24 days after he received notice of the meeting. It is not reasonable to assume that a demand on the board or a vote against the renewal would have had any significant effect on defendants' actions, particularly in view of the legal theory behind plaintiff's claims. In an action brought for the benefit of a corporation, where the alleged basis of liability is failure to discharge a fiduciary duty because of a personal gain motive, it would require a much stronger showing than is here present to render such defenses applicable.

I conclude that the defenses of estoppel and acquiescence are not available to defendants here.

Before concluding this opinion, it would not be amiss to reemphasize that, as construed, plaintiff's claims are based solely on the principle that fiduciaries misused their power for purely personal gain. As such, they are nothing "new" and do not "clash" with the rule that stockholders are generally entitled to sell their shares for whatever they can get.

Defendants' motion for summary judgment is denied.

Present order on notice.